# IN THE COURT OF APPEALS OF IOWA

No. 19-0598
Filed July 24, 2019

**IN THE INTEREST OF M.M.,**
**Minor Child,**

**K.C., Mother,**
　　Appellant.

_____

　　Appeal from the Iowa District Court for Polk County, Rachael E. Seymour, District Associate Judge.


　　A mother appeals a district court order terminating her parental rights to her child. **AFFIRMED.**


　　Agnes Warutere, Clive, for appellant mother.

　　Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

　　Brent M. Pattison of Drake Legal Clinic, Des Moines, attorney and guardian ad litem for minor child.


　　Considered by Vaitheswaran, P.J., and Tabor and Bower, JJ.

**VAITHESWARAN, Presiding Judge.**

The juvenile court terminated parental rights to a child, born in 2015. The court of appeals reversed the termination decision as to the mother after finding insufficient evidence to support the ground for termination cited by the court. *See In re M.M.*, No. 17-0237, 2017 WL 2461889, at *3 (Iowa Ct. App. June 7, 2017). The court remanded the matter for further proceedings. *Id.* On remand, the juvenile court again terminated the mother's parental rights. The mother appealed.

The mother contends the State failed to prove the grounds for termination cited by the juvenile court. We may affirm if we find clear and convincing evidence to support either of the grounds. *See In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010). We focus on Iowa Code section 232.116(1)(h) (2018), which requires proof of several elements, including proof the child cannot be returned to the mother's custody.

The circumstances precipitating State intervention in 2015 were described in this court's prior opinion. We stated the original "case was initiated following a single incident of domestic violence between the father and the mother . . . and perpetrated by the father." *M.M.*, 2017 WL 2461889, at *2. After the incident, the court noted that the mother "relocated from Iowa to live with her mother in Missouri" and "chose to relocate to obtain a fresh start and have a safer environment for herself and her children." *Id.* The court acknowledged, "[T]he mother made false representations to the department of human services and the juvenile court regarding her relationship with the father," denying "any ongoing relationship with the father while she maintained a covert relationship with him." *Id.* Nonetheless, the court determined, "[T]he State ignore[d] credible evidence the mother . . .

sought to improve her life, generally, and address the risk of domestic violence."

*Id.* at *3.

At the same time, the court found insufficient evidence to show the father "pose[d] a material risk of harm to the child." The court reasoned as follows:

> This case arose out of a single incident of domestic abuse. While any single incident is one too many, we are not presented with a case where the father has a lengthy history of violence. The mother has moved away from the father. The mother has obtained insight into issues of domestic violence, including prevention and coping mechanisms. She resides with her family and has an additional layer of protection because of them . . . . [A Missouri] social worker also testified she did not have any concerns the father was in Missouri with the mother.

*Id.*

Following remand, the department of human services adopted the goal of reunifying mother and child and pursued the goal for more than one year. The mother participated in reunification services and made so much progress in joint therapy sessions with her child that the department explored weekend visits at the mother's home. Shortly thereafter, the mother curtailed contact with the child for two months and made a single phone call in the third month. She continued her disengagement and, in time, the State filed a second petition to terminate her parental rights. As noted, the juvenile court granted the termination petition. The court found:

> Despite the extensive services offered, the mother has continued to engage in unsafe relationships to include her relationship with this child's biological father who continues to have unresolved domestic violence issues. The mother has blatantly lied about her relationships a[nd] has repeatedly been dishonest while under oath. At this point, her statements cannot be trusted given the variety of different things she has lied about. She continues to lack[] insight as to who are unsafe persons. Perhaps most importantly she has failed

to understand or provide for this child's basic emotional needs and lacks a healthy attachment to the child.

Clear and convincing evidence supports the court's findings.

At the second termination hearing, the State called the mother as a witness. She minimized the act of domestic violence that led to State involvement in 2015. Specifically, she characterized the initial act of domestic violence as "wrestling" and testified she "[d]idn't know at the time that wrestling is considered a domestic assault if you end up with concussion or bruises."

Next, the mother rejected this court's determination that she moved to Missouri to improve her life and to address the risk of domestic violence. When asked about the move, she responded, "I didn't move to Missouri to get away from [the father]. I moved to Missouri to be with my mother because I needed that emotional support because at the time nobody allowed me to be around [the father]." When confronted with her prior testimony about her reason for the move, the mother stated, "I've been trying to tell you it's never been accurate." When asked if she was "still in a relationship with [the father] when [she] moved to Missouri," she answered, "Yes." She also admitted the father came to Missouri for the birth of another child and he "was there for Thanksgiving . . . and Christmas" 2016. Finally, while minimizing the first act of violence that led to the child's removal, the mother admitted the father committed acts in Missouri that could have been construed as domestic violence, forcing her to seek and obtain a no-contact order in that State. In short, the mother undermined the rationale for this court's reversal of the first termination decision—a single act of violence by the

father; her relocation to avoid further violent acts; and her development of insight into "issues of domestic violence."

The mother went even further, testifying she returned to Iowa and moved in with the father months before the second termination hearing. Prior to the move, she told the department caseworker it was unsafe for her children to be around the father. Although the State did not present evidence of physical acts of violence by the father after the couple reunited, the mother's therapist expressed concerns about codependency and said she discussed the "pros and cons" of living with the father "and how that might impact her case."

Equally concerning was the mother's failure to prioritize her relationship with her child. In the eight months preceding the termination hearing, she acknowledged seeing the child "[i]n person" only four times. Although she claimed to have made "over 15 phone calls" to the child in the two months preceding the hearing, call logs did not corroborate her testimony.

The lapse in contact had a negative effect on the child. A therapist charged with facilitating the mother-child relationship testified that, at a joint session three months before the second termination hearing, the child "refused to have contact with the mother. Wouldn't look at her, didn't engage with her, didn't reference her, just ignored her, and had a good time playing by herself in the room." The therapist wrote, "[Y]ou might expect that [from a] child who hadn't seen their primary caretaker in almost six months." She testified, "[I]t was obvious that the relationship ha[d] been harmed. And because the relationship ha[d] been harmed, [the child] no longer was looking to her mother for any kind of support or help." She characterized the mother's actions toward her child as "out of sight, out of

mind." Similarly, at a doctor's appointment for the child attended by the mother two months before the termination hearing, the department case worker testified the child "had her face turned away from [the mother] and wouldn't engage with her."

We conclude the State proved that the child could not be returned to the mother's custody as required by Iowa Code section 232.116(1)(h). We affirm the juvenile court's termination of her parental rights to the child.

**AFFIRMED.**